UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X

JOE HAND PROMOTIONS, INC.,

                    Plaintiff,              **NOT FOR PUBLICATION**

        -against-                           **MEMORANDUM & ORDER**

ERICA L. ELMORE,                            11-CV-3761 (KAM)(SMG)
Jointly, and as officer, director,
shareholder, and/or principal of
JUST LIKE PHILLY, INC.,
d/b/a THE RIB BAR & GRILL

            and

JUST LIKE PHILLY, INC.,
d/b/a THE RIB BAR & GRILL

                    Defendants.

--------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

        Joe Hand Promotions, Inc. ("Plaintiff") brings this

action against Just Like Philly, Inc.[1] d/b/a The Rib Bar & Grill

in Bronx, New York[2] (the "Establishment") and against Erica L.

---

[1] Just Like Philly, Inc. was incorporated in New York State as a
domestic business corporation in 2008; however, according to the New York
Department of State's Corporation and Business Entity Database, Just Like
Philly, Inc. has been inactive as of October 26, 2011 due to "dissolution by
proclamation/annulment of authority." http://www.dos.ny.gov/corps/bus_entity
_search.html (last visited 5/28/13).

[2] Although Plaintiff filed this action in the Eastern District of
New York, the Complaint and Amended Complaint note that venue is proper in
the Southern District of New York pursuant to 28 U.S.C. § 1391(b). (Compl.
¶ 1-3; Am. Compl. ¶ 1-3.) Such an inconsistency raises concerns regarding
whether venue is proper in this district. Nevertheless, it is well settled
that improper venue is a waivable defense, and "[a] district court may not
dismiss a case *sua sponte* for improper venue absent extraordinary
circumstances." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir.
1999); *Pisani v. Diener*, No. 07-CV-5118, 2009 WL 749893, at *23 n.6 (E.D.N.Y.
Mar. 17, 2009) ("[T]he Court recognizes that a *sua sponte* dismissal for
improper venue would be unwarranted absent extraordinary circumstances.");
*see also Joseph v. N.Y.C. Dep't of Corr.*, No. 10-CV-1265, 2011 WL 1843162, at
*2 n.3 (E.D.N.Y. May 13, 2011) ("[A]lthough it is unclear whether venue is

Elmore ("Elmore"), jointly, and as an officer, director,

shareholder, and/or principal of the Establishment,

(collectively, "Defendants"), for the alleged violation of the

Federal Communications Act of 1934, 47 U.S.C. §§ 553, 605. (*See*

*generally* EFC No. 17, Amended Complaint dated 3/1/12 ("Am.

Compl.").)

Upon failure of Defendants to appear, answer, or

respond to the Amended Complaint, Plaintiff now moves for (1)

entry of a default judgment; (2) basic statutory damages in the

amount of $5,000; and (3) enhanced statutory damages in the

amount of $50,000 against Defendants, joint and severally, for

---

proper in this district, because Defendants have failed to raise this
argument in their initial papers, they have waived any objections to improper
venue."). Here, Defendants have not responded to the Complaint or Amended
Complaint and have similarly failed to raise any objections to venue in the
Eastern District. Not having done so, Defendants have waived their right to
object to improper venue. *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960) ("A
defendant, properly served with process by a court having subject matter
jurisdiction, waives venue by failing seasonably to assert it, or even simply
by making default."); *Commercial Cas. Ins. Co. v. Consol. Stone Co.*, 278 U.S.
177, 179-80 (1928) ("We are of opinion that the privilege [of challenging
venue] is of such a nature that it must be asserted at latest before the
expiration of the period allotted for entering a general appearance and
challenging the merits."). Because the court finds no extraordinary
circumstances warranting *sua sponte* dismissal of this case for improper
venue, the court declines to dismiss this case on that ground.
    Nor does the court find that *sua sponte* transfer of this action
to the Southern District of New York is warranted, particularly in light of
the significant judicial resources already expended by the court in
considering the instant default motion as well as Defendants' failure to
raise any objection to venue. *See Concession Consultants, Inc. v. Mirisch*,
355 F.2d 369, 371-72 (2d Cir. 1966) ("Since the right to attack venue is
personal to the parties and waivable at will, a district judge should not, in
the absence of extraordinary circumstances, impose his choice of forum upon
the parties by deciding on his own motion that there was a lack of proper
venue."); *Joseph*, 2011 WL 1843162, at *2 n.3. The court declines to transfer
venue and proceeds to the merits of Plaintiff's default motion.

the violation of 47 U.S.C. § 605(a).[3] (ECF No. 28, Exh. 1,

Plaintiff's Memorandum in Support of Second Motion for Default

Judgment ("Pl. Mem.") at 17.) Plaintiff also seeks conversion

damages,[4] attorney's fees in the amount of $3,165, costs in the

amount of $1,000, and post-judgment interest at the highest

lawful rate. (*Id.* at 17-18.) Finally, Plaintiff requests a

permanent injunction that enjoins Defendants from ever

intercepting or exhibiting an unauthorized program in violation

of the Federal Communications Act. (*Id.* at 18.) Defendants have

not appeared, answered the Complaint or Amended Complaint, or

submitted any opposition to Plaintiff's two motions for entry of

---

[3] Plaintiff's motion for default judgment contains an inconsistency in the requested award for statutory damages under 47 U.S.C. § 605(e). Specifically, in its memorandum in support of its motion for default judgment, Plaintiff "respectfully requests $10,000 in [basic] statutory damages . . . in addition to enhanced statutory damages in the amount of $20,000 against the Defendants," for a total damages award of $30,000. (Pl. Mem. at 8.) Yet, in the final pages of its memorandum, Plaintiff requests $5,000 in basic statutory damages and $50,000 in enhanced statutory damages, for a total amount of $55,000 in statutory damages. (*See id.* at 17.) This latter total amount is consistent with the Proposed Order attached to Plaintiff's second motion for default judgment, in which Plaintiff requests a total damages award of $55,000. (ECF No. 28, Exh. 5, Proposed Order for Default Judgment ("Proposed Order") at 2.) Accordingly, notwithstanding Plaintiff's careless drafting and proofreading, the court construes Plaintiff's default motion to request damages in the higher amount of $55,000.

[4] Plaintiff's motion for default judgment also contains numerous inconsistencies in the requested award for conversion damages. At one point in Plaintiff's memorandum in support, Plaintiff "seeks $3,300.00 in conversion damages, three times the amount defendant would have been required to pay had he ordered the *Event* from Plaintiff at the time the fight was aired." (Pl. Mem. at 16.) Plaintiff thereafter requests conversion damages "in the amount of $1,100, the amount Defendants would have been required to pay had he ordered the Event from Plaintiff." (*Id.* at 17.) Plaintiff's Proposed Order provides no guidance in determining the intended amount of requested conversion damages. (*See* Proposed Order at 1-2.) Nevertheless, the court need not resolve this inconsistency because, as set forth below, Plaintiff is not entitled to conversion damages in any amount. (*See infra* Discussion, Part III.D.)

default judgment, despite having received notice and an opportunity to do so. (*See* ECF Nos. 6 & 7, Affidavits of Service of Summons and Compl. on Elmore and the Establishment; ECF Nos. 18 & 19, Affidavits of Service of Am. Compl. on the Establishment and Elmore; ECF No. 25, Exh. 10, Certificate of Service of First Motion for Default Judgment; ECF No. 28, Exh. 6, Certificate of Service of Second Motion for Default Judgment.)

For the reasons set forth below, the court grants Plaintiff's motion for entry of default judgment against Elmore and the Establishment, jointly and severally, and, pursuant to 47 U.S.C. §§ 605(e)(3)(C)(i)(II), 605 (e)(3)(C)(ii), and 605 (e)(3)(B)(iii), orders that judgment be awarded in favor of Plaintiff in the amount of $4,965.80, comprised of basic statutory damages of $1,538.60, enhanced statutory damages of $3,077.20, and costs of $350. Plaintiff will also be entitled to interest on the judgment at the post-judgment rate prescribed by law, accruing from the date of entry of judgment until the date the judgment is paid in full. Finally, the court denies Plaintiff's requests for conversion damages, attorney's fees, and permanent injunctive relief.

## I.  Facts[5]

Plaintiff acquired the rights to distribute the UFC
123: Machida v. Jackson Broadcast, including all undercard
bouts, held on November 20, 2010 (the "Program"), which was
broadcasted via closed circuit television and encrypted
satellite signal. (Am. Compl. ¶ 14.)  Plaintiff owned the
exclusive commercial distribution rights in and to the Program.
(*See* Pl. Mem. at 2; ECF No. 28, Exh. 1A-1, Distribution
Agreement ("Distrib. Agree.") at 1-2).  The Program originated
via satellite uplink and was subsequently re-transmitted to
cable systems and satellite companies via satellite signal. (Am.
Compl. ¶ 14.)  Plaintiff marketed the sub-licensing rights in
the Program to commercial customers for a fee. (Pl. Mem. at 2;
ECF No. 28, Ex. 1A, Affidavit of Joe Hand, Jr. ("Hand Aff.")
¶ 3.)  Additionally, Plaintiff contracted with various business
entities in New York State, allowing those businesses to exhibit
the Program to their patrons. (Am. Compl. ¶ 15.)

To protect its exclusive distribution rights to the
Program, Plaintiff enlisted independent auditors to identify and
visit establishments that exhibited the Program without
Plaintiff's authorization. (Pl. Mem. at 2-3.)  Plaintiff

---

[5] The following undisputed facts are taken from Plaintiff's
Amended Complaint, Plaintiff's second motion for default judgment, and the
documentary evidence attached thereto.

provided the auditors with a confidential list of customers that
were authorized to broadcast the Program to ensure that the
auditors would visit only locations that were not authorized to
broadcast the Program. (Hand Aff. ¶ 6.)  Plaintiff includes with
its motion for default judgment the Affidavit of independent
auditor James Osgood, who visited the Establishment at
approximately 12:10 a.m. on November 21, 2010.[6] (ECF No. 28, Ex.
1A-2, Affidavit of James Osgood dated 12/4/10 ("Osgood Aff.").)
At that time, Mr. Osgood observed eight television sets[7]
exhibiting the Program and approximately twenty-five to twenty-
eight individuals in the Establishment, which, in Mr. Osgood's
opinion, had an approximate capacity of seventy-five people.
(*Id.* at 1-2.)  Mr. Osgood did not observe a satellite dish on
the premises and was not required to pay a cover charge to enter
the Establishment. (*Id.* at 1.)

---

[6] Although Plaintiff alleges that the events in question occurred
on the evening of November 20, 2010, Mr. Osgood's Affidavit states that he
observed the unlawful showing of the Program on November 21, 2010. (*Compare*
Am. Compl. ¶ 7-8, *with* Osgood Aff. at 1.)  This discrepancy can be
reconciled.  Mr. Osgood arrived at the Establishment at approximately 12:10
a.m. on November 21st and viewed the second round of the main event. (Osgood
Aff. at 1.)  According to the official Ultimate Fighting Championship rules
on round length, each round consists of no more than five minutes duration,
with a rest period of one minute between each round. *See* Unified Rules and
Other MMA Regulations, Rules and Regulations, http://www.ufc.com/discover/
sport/rules-and-regulations#12 (last visited 5/28/13).  Assuming that Mr.
Osgood observed the beginning of round two of the main event, the first round
of the main event would likely have begun around 12:04 a.m. on November 21st.
Accounting for the time of the several undercard bouts, the Program, which
included the broadcast of those undercard bouts, likely commenced on the
evening of November 20, 2010.
[7] In yet another instance of Plaintiff's careless drafting in
support of its default motion, the memorandum at page 12 notes that there
were six televisions and on page 3 notes that there were eight televisions at
the time of the event at issue. (*Compare* Pl. Mem. at 3, *with id.* at 12.)

Plaintiff alleges that Defendants and/or their agents unlawfully intercepted, received, and/or de-scrambled the Program's broadcast signal and thereafter exhibited the Program at the Establishment without Plaintiff's authorization. (Am. Compl. ¶¶ 17, 27.) Plaintiff further alleges that in order to broadcast the Program, Defendants either used an illegal satellite receiver, misrepresented the Establishment as a residence, removed an authorized satellite receiver from a residence to the Establishment to intercept the broadcast, or intercepted the Program's broadcast signal via cable system. (*Id.* ¶¶ 18, 26-27.) According to Joe Hand, the owner of Joe Hand Promotions, the Program is not and cannot be mistakenly, innocently, or accidently intercepted. (Hand Aff. ¶ 9.) Finally, Plaintiff alleges that Defendants unlawfully obtained possession of the Program and wrongfully, willfully, and maliciously converted the Program to its own use and benefit, thereby intentionally subjecting Plaintiff to economic distress. (*See* Am. Compl. ¶¶ 32-33.)

## II. Procedural History

Plaintiff filed the instant action on August 3, 2011 and thereafter properly served the Summonses and Complaint on Defendants. (ECF No. 1, Complaint dated 8/1/11 and filed 8/3/11 ("Compl."); ECF Nos. 6 & 7, Affs. of Serv. of Summons and Compl. on Elmore and Establishment.) On February 28, 2012, the court

7

ordered Plaintiff to file an Amended Complaint because the initial Complaint contained factual allegations that Plaintiff acknowledged were inaccurate. (Order dated 2/28/12.) On March 6, 2012, Plaintiff served the Amended Complaint on Defendants. (ECF Nos. 18 & 19, Affs. of Serv. of Am. Compl. on the Establishment and Elmore.)

At Plaintiff's request, the Clerk of the Court entered default against Defendants on April 20, 2012 in light of Defendants' failure to answer the Amended Complaint or otherwise appear in the action. (ECF No. 20, Request for Certificate of Default; ECF No. 21, Clerk's Entry of Default against Elmore; ECF No. 22, Clerk's Entry of Default against the Establishment.) On June 14, 2012, Plaintiff filed its first motion for entry of default judgment. (*See* ECF No. 25, Plaintiff's First Motion for Default Judgment dated 6/14/12.) By Order dated January 30, 2013, the court denied Plaintiff's first default motion without prejudice on the grounds that Plaintiff failed to serve Defendants with the Clerk's certificates of default as required by Local Civil Rule 55.2. (*See* Minute Order dated 1/30/13.) On February 14, 2013, Plaintiff properly served copies of the Clerk's certificates of default on Defendants and timely filed a second motion for default judgment.[8] (ECF No. 27, Certificate of

---

[8] Plaintiff's second motion for entry of default judgment is substantively identical to its first motion for entry of default judgment.

Service of Clerk's Certificates of Default; Pl. Mem.)  To date,

Defendants have not appeared, answered, or otherwise responded

to Plaintiff's Complaint, Amended Complaint, or motions for

entry of default judgment.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 55, a

movant must complete a two-step process to obtain a default

judgment. *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d

114, 123 (E.D.N.Y. 2011); *La Barbera v. Fed. Metal & Glass

Corp.*, 666 F. Supp. 2d 341, 346-47 (E.D.N.Y. 2009).  First, the

Clerk of the Court must enter default "[w]hen a party against

whom a judgment for affirmative relief is sought has failed to

plead or otherwise defend, and that failure is shown by

affidavit or otherwise." Fed. R. Civ. P. 55(a); *Enron Oil Corp.

v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993).  Second, upon the

Clerk's entry of default, the movant "may then make an

application for entry of a default judgment, pursuant to Fed. R.

Civ. P. 55(b)." *Rodriguez*, 784 F. Supp. 2d at 123.  "'The court

is to exercise sound judicial discretion' in determining whether

the entry of default judgment is appropriate." *Trs. of Local 7

Tile Indus. Welfare Fund v. City Tile, Inc.*, No. 10-CV-322, 2011

WL 917600, at *1 (E.D.N.Y. Feb. 18, 2011) (quoting *Badian v.

Brandaid Commc'ns Corp.*, No. 03-CV-2424, 2004 WL 1933573, at *2

(S.D.N.Y. Aug. 30, 2004)), *adopted by* 2011 WL 864331 (E.D.N.Y.

Mar. 10, 2011). "In evaluating a motion for default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2), the [c]ourt must accept as true the well-pleaded allegations in the complaint," except those relating to damages. *Id.* at *2 (citing *Credit Lyonnais Sec. (USA), Inc. v. Alcantara,* 183 F.3d 151, 154–55 (2d Cir. 1999)).

Here, the Clerk of the Court entered a default against Defendants on April 20, 2012, and Plaintiff thereafter filed the unopposed motion for default judgment presently before the court. As previously noted, Defendants have neither appeared nor moved to vacate the Clerk's entry of default. Consequently, plaintiff has completed the necessary steps to obtain a default judgment. *See Bricklayers Ins. & Welfare Fund v. David & Allen Contracting, Inc.*, No. 05-CV-4778, 2007 WL 3046359, at *2 (E.D.N.Y. Oct. 16, 2007) ("In civil actions, when a party fails to appear after given notice, the court normally has justification for entering default.") (citing *Bermudez v. Reid,* 733 F.2d 18, 21 (2d Cir. 1984)).

## I.   Corporate Liability of the Establishment

Defendants' default in this case, however, "does not necessarily conclusively establish . . . defendant[s'] liability." *Trs. of the Plumbers Local Union No. 1 Welfare Fund v. Philip Gen. Constr.*, No. 05-CV-1665, 2007 WL 3124612, at *3 (E.D.N.Y. Oct. 23, 2007). As such, this court "must still

determine whether . . . plaintiff has stated a cause of action."
*Bd. of Trs. of the UFCW Local 174 Pension Fund v. Jerry WWHS
Co.*, No. 08-CV-2325, 2009 WL 982424, at *3 (E.D.N.Y. Apr. 10,
2009) (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65
(2d Cir. 1981)); *Philip Gen. Constr.*, 2007 WL 3124612, at *3
("Nevertheless, '[e]ven after default it remains for the court
to consider whether the unchallenged facts constitute a
legitimate cause of action, since a party in default does not
admit mere conclusions of law.'" (alteration in original)
(quoting *In re Wildlife Ctr., Inc.*, 102 B.R. 321, 325 (Bankr.
E.D.N.Y. 1989))).

Here, Plaintiff's Amended Complaint alleges that the
Establishment violated either 47 U.S.C. § 553 or 47 U.S.C.
§ 605. (Am. Compl. ¶ 30.) Section 553(a)(1) provides that:

> No person shall intercept or receive or assist in
> intercepting or receiving any communications
> service offered over a cable system, unless
> specifically authorized to do so by a cable
> operator or as may otherwise be specifically
> authorized by law.

47 U.S.C. § 553. Section 605(a) provides that:

> No person not being authorized by the sender
> shall intercept any radio communication and
> divulge or publish the existence, contents,
> substance, purport, effect, or meaning of such
> intercepted communication to any person. No
> person not being entitled thereto shall receive
> or assist in receiving any interstate or foreign
> communication by radio and use such communication
> (or any information therein contained) for his

own benefit or for the benefit of another not
entitled thereto.

47 U.S.C. § 605.

Sections 553 and 605 are not mutually exclusive, and
both statutes apply when television programming is transmitted
over *both* cable and satellite. *Int'l Cablevision, Inc. v. Sykes*,
75 F.3d 123, 133 (2d Cir. 1996); *Kingsvision Pay-Per-View Corp.
v. Keane*, No. 02-CV-5173, 2006 WL 1704474, at *3 (E.D.N.Y. June
16, 2006) ("[S]ections 553 and 605 are not mutually exclusive
and when certain television programing is transmitted or
intercepted over both cable and satellite mediums, both statutes
apply."). Plaintiff, however, acknowledges that it is unaware
of the exact method by which the Establishment intercepted the
Program and specifically notes that

> [w]ithout further Discovery from . . .
> Defendants, Plaintiff cannot determine if
> Defendants intercepted Plaintiff's signal
> via a cable system, in violation of 47
> U.S.C. § 553, or via a satellite
> transmission, in violation of 47 U.S.C.
> § 605. As such, Plaintiff is alleging two
> (2) counts in its Complaint. Plaintiff
> recognizes that Defendants [in this case]
> can be liable for only (1) of these
> statutes.

(Am. Compl. ¶ 30.) Moreover, in its default motion, Plaintiff
has elected to recover damages from both Defendants under § 605,
rather than § 553. (Pl. Mem. at 5 ("Plaintiff has established
that Defendant violated § 605 and chooses to proceed pursuant to

12

the same on this basis as well."); *see id.* at 6-14.)[9]
Accordingly, the court will assess the Establishment's liability
under § 605.

Plaintiff's undisputed allegations and unopposed
submissions establish that the Establishment violated § 605.
Although by its text § 605 applies explicitly to radio
transmissions, courts have held that § 605 applies to cases
involving "cable-borne transmissions [that] originate as
satellite transmissions." *Keane*, 2006 WL 1704474, at *3 (citing
*Sykes*, 75 F.3d at 130). Here, Plaintiff obtained exclusive
distribution rights to the Program and subsequently entered into
sub-license agreements with various commercial entities. (Am.
Compl. ¶ 15.) These sub-licensing agreements permitted
authorized commercial entities to broadcast the Program to their
patrons via satellite. (*See id.*) As alleged in the Amended
Complaint, the Establishment, without entering into a sub-
licensing agreement or obtaining Plaintiff's authorization,
knowingly and willfully intercepted, received, or de-scrambled
the Program's broadcast signal via satellite transmission and
thereafter exhibited the Program to its patrons for commercial
advantage and private financial gain. (*Id.* ¶¶ 17-20.) According

---

[9] Additionally, Plaintiff recognizes that "when a Defendant is
liable under both § 553 and § 605, an aggrieved Plaintiff may choose to
recover damages under only one section." (Pl. Mem. at 5 (citing *Entm't by
J&J, Inc. v. Mama Zee Rest. & Catering Servs., Inc.*, No. 01-CV-3945, 2002 WL
2022522, at *3 (E.D.N.Y. May 21, 2002).)

to Plaintiff, the Establishment likely utilized an illegal satellite receiver, misrepresented itself as a residence, or impermissibly utilized a residential satellite receiver to intercept the Program's broadcast signal. (*Id.* ¶ 18.) Furthermore, as observed by independent auditor Mr. Osgood, the Establishment exhibited the Program on eight television sets to twenty-five to twenty-eight customers on or around the night of November 20, 2010. (*See* Osgood Aff. at 1-2.) Taken together, Plaintiff's allegations demonstrate that the Establishment is liable for damages under § 605.

## II. Individual Liability of Elmore

Plaintiff also names Elmore as an "officer, director, shareholder and/or principal" of the Establishment. (*See* Am Compl. ¶ 6.) Plaintiff alleges that, upon information and belief, Elmore was the individual with supervisory capacity and control over activities occurring within the Establishment on November 20, 2010. (*Id.* ¶ 7.) Plaintiff further alleges that Elmore received a financial benefit from the operations of the Establishment on the night of November 20th. (*Id.* ¶ 8.)

"Individual liability under the Cable Act requires that the individual authorize the underlying violations." *J&J Sports Prods., Inc. v. 291 Bar & Lounge, LLC*, 648 F. Supp. 2d 469, 473 (E.D.N.Y. 2009) (citing *J&J Sports Prods., Inc. v. Benson,* No. 06-CV-1119, 2007 WL 951872, at *7 (E.D.N.Y. Mar. 27,

2007)).  "Put differently, the complaint must establish that the individual had a 'right and ability to supervise' the violations, as well as an obvious and direct financial interest in the misconduct." *Id.* (citing *Softel, Inc., v. Dragon Med. & Scientific Commc'ns, Inc.,* 118 F.3d 955, 971 (2d Cir. 1997)).

The undisputed allegations in the Amended Complaint establish that Elmore is an officer, director, shareholder and/or principal of the Establishment; that Elmore had supervisory capacity and control over the activities in the Establishment on the date of the alleged violation; and that she received a financial benefit as the sole proprietor of the Establishment as a result of the unauthorized broadcast. (*See* Am. Compl. ¶¶ 6-8); *see Benson*, 2007 WL 951872, at *7. Therefore, the court determines that Elmore is jointly and severally liable with the Establishment for the violation of 47 U.S.C. § 605(a) discussed above.  Accordingly, the court finds that Plaintiff's award be limited to a single and joint recovery against the individual Defendant, Elmore, and the corporate Defendant, the Establishment.

### III. Damages

As previously noted, in the context of a motion for default judgment, allegations pertaining to liability are deemed admitted, but those pertaining to damages must be proven by the movant. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*,

973 F.2d 155, 158 (2d Cir. 1992) ("While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages."). After liability is determined, damages must be established "to a 'reasonable certainty.'" *Duro v. BZR Piping & Heating Inc.*, No. 10-CV-879, 2011 WL 710449, at *2 (E.D.N.Y. Jan. 26, 2011) (quoting *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997)), *adopted by* 2011 WL 744156 (E.D.N.Y. Feb. 22, 2011). The court need not hold a hearing to determine damages "as long as it [has] ensured that there [is] a basis for damages specified in the default judgment." *Id.* (alterations in original). When evaluating damages, the court "may rely on affidavits or documentary evidence." *Id.* (citing *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d. Cir. 1993); *Chun Jie Yin v. Kim*, No. 07-CV-1236, 2008 WL 906736, at *2 (E.D.N.Y. Apr. 1, 2008)).

### A. *Basic Statutory Damages*

Plaintiffs who seek compensation for damages and lost profits under § 605 may elect to seek either actual damages and lost profits or basic statutory damages. *See* 47 U.S.C. § 605(e)(3)(C)(i); *see also Time Warner Cable v. Googies Luncheonette, Inc.*, 77 F. Supp. 2d 485, 489 (S.D.N.Y. 1999). Plaintiff has opted for statutory damages. (Pl. Mem. at 6.) Where, as here, a party elects to recover statutory damages, it

16

may recover a damages award within the statutory range of $1,000 to $10,000 for each violation of § 605(a). 47 U.S.C. § 605(e)(3)(C)(i)(II). "The amount of damages to be awarded pursuant to § 605 rests in the sound discretion of the court." *J&J Sports Prods., Inc. v. Hot Shots, Inc.*, No. 09-CV-1884, 2010 WL 3522809, at *2 (E.D.N.Y. Apr. 27, 2010) (citing 47 U.S.C. § 605(e)(3)(C)(i)(II)), *adopted by* 2010 WL 3523003 (E.D.N.Y. Sept. 2, 2010).

As other courts have noted, § 605 provides no statutory definition of the term "violation." *See, e.g.*, *Garden City Boxing Club, Inc. v. Perez*, No. 05-CV-3713, 2006 WL 2265039, at *5 (E.D.N.Y. Aug. 8, 2006). "However, most cases applying this statute in a commercial context have interpreted the showing of an event on a single night as one violation." *Id.* "In determining the amount of damages that can be imposed for each violation within the range of $1,000 to $10,000 per violation, Section 605 leaves the decision within the sound discretion of the court." *Id.* Here, the unauthorized broadcast of the Program commenced late on November 20, 2010 and lasted into the early morning of November 21, 2010, thus taking the form of one continuous, night-long event. (*See* Am. Compl. ¶ 14; Osgood Aff. at 1-2.) As such, the court finds that Defendants are subject to liability for one violation of § 605.

"Although § 605 provides little guidance as to how to set damages within the statutory range [for each violation], 'courts in [the Second Circuit] have relied upon one of two methods of calculating statutory damages in cases involving the unauthorized receipt and exhibition of pay-per-view events'" by commercial establishments. *Kingvision Pay-Per-View Ltd. v. Autar*, 426 F. Supp. 2d 59, 63 (E.D.N.Y. 2006) (quoting *Garden City Boxing Club, Inc. v. Morales*, No 05-CV-64, 2005 WL 2476264, at *6 (E.D.N.Y. Oct. 7, 2005)); *see also Circuito Cerrado, Inc. v. Pizzeria y Pupuseria Santa Rosita, Inc.*, 804 F. Supp. 2d 108, 115 (E.D.N.Y. 2011); *Googies Luncheonette,* 77 F. Supp. 2d at 489. The first method assesses the award of damages based upon the number of patrons in the establishment who viewed the unauthorized broadcast. *See, e.g.*, *Googies Luncheonette*, 77 F. Supp. 2d at 489 (collecting cases); *Time Warner Cable v. Taco Rapido Rest.*, 988 F. Supp. 107, 111 (E.D.N.Y. 1997) (awarding damages on a per-patron basis); *Cablevision Sys. Corp. v. 45 Midland Enters.*, 858 F. Supp. 42, 45 (S.D.N.Y. 1994) (same). The second method awards a flat sum for each violation. *E.g.*, *Googies Luncheonette*, 77 F. Supp. 2d at 489-90 (collecting cases); *see also Entm't by J&J, Inc. v. Suriel*, No. 01-CV-11460, 2003 WL 1090268, at *1 (S.D.N.Y. Mar. 11, 2003) (awarding a flat sum of $11,000 for basic and enhanced damages); *Kingvision Pay-Per-View, Ltd. v. Jasper Grocery*, 152 F. Supp. 2d 438, 442-43

(S.D.N.Y. 2001); *Cablevision Sys. Corp. v. Maxie's N. Shore Deli Corp.*, No. 88-CV-2834, 1991 WL 58350, at *2 (E.D.N.Y. Mar. 20, 1991) (awarding flat sum "based on the Court's view of the equities and not the estimate of the number of patrons").

Where, as here, there is undisputed evidence of the number of patrons viewing the match in an establishment, courts have used the first approach and multiplied the number of patrons by a set sum – the price to view the event at home on a pay-per-view channel. *See, e.g.*, *Kingvision Pay-Per-View Ltd. v. Cazares*, No. 05-CV-2934, 2006 WL 2086031, at *3-4 (E.D.N.Y. July 25, 2006) (54.95 per patron); *J&J Sports Prods., Inc. v. Arhin*, No. 07-CV-2875, 2009 WL 1044500, at *6 (E.D.N.Y. Apr. 17, 2009) (same). This is based on the theory that the patrons who watched the unauthorized broadcast would have ordered it individually for residential use. *See, e.g.*, *Googies Luncheonette*, 77 F. Supp. 2d at 490.

Notably, courts use per-patron calculations as a "starting point" for calculating damages, *Entm't by J&J Inc. v. Nina's Rest. & Catering*, No. 01-CV-5483, 2002 WL 1000286, at *3 (S.D.N.Y. May 9, 2002), particularly in cases where the sum of per-patron damages is less than the fee that the Establishment would have paid for a sub-license to broadcast the Program, *see J&J Sports Prods., Inc. v. Meson de Colombia, Inc.*, No. 10-CV-1142, 2010 WL 4791771, at *3 (E.D.N.Y. Oct. 7, 2010), *adopted by*

2010 WL 4789964 (E.D.N.Y. Nov. 18, 2010).  In *Meson de Colombia,* for example, the court awarded $1,500 in statutory damages based on the sub-license fee because the per-patron sum of $1,000 was "slightly less" than the sub-license fee. 2010 WL 4791771, at *3.

Here, Plaintiff's motion for default judgment seeks basic statutory damages under § 605(e)(3)(C)(i)(II) in the amount of $5,000 and provides uncontradicted evidence of the number of patrons who viewed the Program on November 20, 2010. (*See* Pl. Mem. at 17; Proposed Order at 2; Osgood Aff. at 2.)  In particular, Mr. Osgood stated that he observed between twenty-five and twenty-eight individuals in the Establishment on the night of the unauthorized broadcast and further averred that the Establishment had an estimated capacity of seventy-five people. (Osgood Aff. at 2.)  Although Plaintiff has not offered any evidence of the fee for individual non-commercial customers, "[d]istrict courts [in New York] have recently used $54.95, which is the price an individual would have to pay to view the event at home." *Garden City Boxing Club, Inc. v. 135 Hunt Station Billiard, Inc.*, No. 07-CV-3849, 2012 WL 4328355, at *4 (E.D.N.Y. June 21, 2012) (using $54.95 as a standard price where defendants broadcasted boxing match without obtaining a sub-license from the owners), *adopted by* 2012 WL 4328347 (E.D.N.Y. Sept. 19, 2012); *Hot Shots, Inc.*, 2010 WL 3522809, at *2

20

("[C]ourts have often multiplied the number of patrons by $54.95, the price an individual would pay to view the event at home on a pay-per-view channel."). Thus, the per-patron analysis method of calculating statutory damages for the maximum amount of people observed – twenty-eight individuals – would yield a total award of $ 1,538.60 ($54.95 x 28). This sum is higher than the flat-fee of $1,100 that Plaintiff would have charged the Establishment for a sub-license[10] to broadcast the Program and also falls above the statutory minimum.

In light of the foregoing, the court finds that an award of basic statutory damages in the higher per-patron amount of $1,538.60 reasonably reflects the injuries suffered by Plaintiff and achieves the deterrent purposes of the Federal Communications Act. *See Hot Shots, Inc.*, 2010 WL 3522809, at *2 ("An award of $54.95 per patron (based on the maximum number of patrons observed) would result in a total award of $2,747.50. This amount is slightly higher than the licensing fee of $2,200 that plaintiff would have charged Hot Shots to broadcast the

---

[10] Plaintiff's sub-license fee is based on the capacity of the establishment and varies for each event. (Hand Aff. ¶ 8.) Based on Mr. Osgood's observations of the Establishment's maximum capacity and Plaintiff's sub-license fee rates, a maximum fire code occupancy of approximately seventy-five people would yield a commercial sub-license fee of $1,100. (Hand Aff. ¶ 8; ECF No. 28, Ex. 1A-3, Rate Card.)

event legally. . . . I therefore find the per-patron amount
reasonable . . . .").[11]

## B. *Enhanced Statutory Damages*

Plaintiff further seeks enhanced statutory damages for
willfulness pursuant to § 605(e)(3)(C)(ii) in the amount of
$50,000. (Pl. Mem. at 17.)  The court, in its discretion, may
award an enhancement of statutory damages of up to $100,000
where Plaintiff demonstrates that Defendants' violation was
willful and committed for the "purposes of direct or indirect
commercial advantage or private financial gain." 47 U.S.C.
§ 605(e)(3)(C)(ii).  The broadcast of an event without
authorization is a deliberate act, and thus establishes
willfulness. *See Taco Rapido Rest.*, 988 F. Supp. at 111; *Googies
Lucheonette*, 77 F. Supp. 2d at 490-91 ("Signals do not
descramble spontaneously, nor do television sets connect
themselves to cable distribution systems.").

Furthermore, the Establishment realized financial gain
by broadcasting the Program because the broadcast "most likely

---

[11] The court rejects as excessive and unreasonable Plaintiff's
request for basic statutory damages in the heightened amount of $5,000. (Pl.
Mem. at 17.)  Although Plaintiff claims that such an amount is necessary to
reflect the severe damage to its goodwill and professional reputation and to
combat pervasive broadcast signal piracy by perpetrators like Defendants,
(*see id.* at 9-10; Hand Aff. ¶¶ 10-12), the court finds that such injuries are
largely speculative and, in any event, unsupported by sufficient evidence.
*See Duro*, 2011 WL 710449, at *2 ("[T]he court must . . . conduct an inquiry
sufficient to establish damages to a 'reasonable certainty.'").  Upon review
of the record, the court finds that an award of $1,538.60 in basic statutory
damages adequately punishes and deters the unlawful activity committed by
Defendants while disgorging them of the profits earned through the
unauthorized broadcast of the Program.

led to an increased number of patrons, and thus to an increase in profits from food and beverages," even if the Establishment did not advertise the Program or charge a cover fee. *Taco Rapido Rest.*, 988 F. Supp. at 111; *cf. J&J Sports Prods. v. Alvarez,* No. 07-CV-8852, 2009 WL 3096074, at *5 (S.D.N.Y. Sep. 25, 2009) (inferring that the illegal broadcast of the event induced customers to patronize the establishment and increased the sale of food and beverages). Consequently, Plaintiff is entitled to a further enhancement of the basic statutory damages award because the record reflects that the Establishment affirmatively and willfully intercepted and broadcasted the Program for financial gain, and that there was no way that the Establishment could have inadvertently intercepted Plaintiff's broadcast. (Hand Aff. ¶ 9; Am. Compl. ¶ 18 (listing the various illegal ways to intercept a broadcasting program's signal.)).

In circumstances demonstrating such willful and purposeful violation, "'it is appropriate to assess enhanced damages in conjunction with statutory damages.'" *135 Hunt Station Billiard, Inc.*, 2012 WL 4328355, at *5 (quoting *J&J Sports Prods., Inc. v. Welch*, No. 10-CV-159 (KAM), 2010 WL 4683744, at *5 (E.D.N.Y. Nov. 10, 2010)). "Courts typically fix the amount of enhanced damages as a multiple of the [basic] statutory damages award." *Id.* "The multiples most commonly used by [the Eastern District of New York] are either two or three

23

times the [basic] statutory damages." *Id.* Here, the court, in
its discretion, finds that Plaintiff is entitled to enhanced
damages in the amount of $3,077.20, or double the basic
statutory damages award of $1,538.60, for Defendants' willful
violation of the Federal Communications Act. *See, e.g.*, *J&J
Sports Prods., Inc. v. Zevallos*, No. 10-CV-4049, 2011 WL
1810140, at *4 (E.D.N.Y. Apr. 22, 2011) (recommending an
enhanced damages award of two times the basic statutory
damages), *adopted by* 2011 WL 1807243 (E.D.N.Y. May 11, 2011);
*Joe Hand Promotions, Inc. v. La Nortena Rest. Inc.*, No. 10-CV-
4965, 2011 WL 1594827, at *5 (E.D.N.Y. Mar. 28, 2011) (same),
*adopted by* 2011 WL 1598945 (E.D.N.Y. Apr. 27, 2011).
Accordingly, the court awards Plaintiff $1,538.60 in basic
statutory damages and $3,077.20 in enhanced statutory damages,
for a total statutory damages award of $4,615.80.

    C.    *Permanent Injunctive Relief*

        Plaintiff also seeks a "permanent injunction that
enjoins Defendants from ever intercepting or exhibiting an
unauthorized program in violation of the Federal Communications
Act." (Pl. Mem. at 18.) "The court may grant temporary and
final injunctions on such terms as it may deem reasonable to
prevent or restrain violations of subsection (a) of [§ 605 of
the Federal Communications Act]." 47 U.S.C. § 605(e)(3)(B)(i);
*see also Cablevision Sys. N.Y.C. Corp. v. Torres*, No. 02-CV-

7602, 2003 WL 22078938, at *4 (S.D.N.Y. Sept. 9, 2003) (citing *Cablevision Sys. N.Y.C. Corp. v. Sencion*, No. 01-CV-7069, 2001 WL 1586685, at *3 (S.D.N.Y. Dec. 12, 2001)). "[A] court 'may . . . issue an injunction on a motion for default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute, and (2) it meets the prerequisites for the issuance of an injunction.'" *Autar*, 426 F. Supp. 2d at 65 (quoting *Main Events/Monitor Prods. v. Batista*, No. 96-CV-5089, 1998 WL 760330, at *1 (E.D.N.Y. Aug. 26, 1998)); *Kingvision Pay-Per-View Ltd. v. Lalaleo*, 429 F. Supp. 2d 506, 516 (E.D.N.Y. 2006). "[A] party seeking a preliminary injunction must demonstrate irreparable harm and the absence of an adequate remedy at law." *Lalaleo*, 429 F. Supp. 2d at 516 (citing *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57 (1975)). Plaintiff has failed to satisfy either of these two conditions and is therefore not entitled to injunctive relief.

In *Lalaleo*, the district court adopted Magistrate Judge Joan Azrack's recommendation to deny plaintiff's request for a permanent injunction on the grounds that plaintiff failed to provide any evidence that it was likely to suffer irreparable harm or that the statutory and enhanced damages under § 605 were insufficient to deter future violations of the statute. *Id.* at 511, 516. Similarly, in *Autar,* the district court rejected the plaintiff's request for permanent injunctive relief because the

25

plaintiff failed to demonstrate the absence of an adequate legal remedy. 426 F. Supp. 2d at 65. Specifically, the court in *Autar* explained that "plaintiff availed itself of its remedies under § 605, and has succeeded in obtaining enhanced damages designed to deter defendants from future violations." *Id.* The court further reasoned that the statutory damages "alerted [defendants] to the unlawful nature of their acts and to the sanctions – both civil and criminal – that may be imposed for future violations" and added that "it is difficult to fathom what this Court's injunction could add to the deterrence offered by § 605." *Id.*

Like the plaintiffs in *Autar* and *Lalaleo*, Plaintiff here has failed to establish the absence of an adequate legal remedy and has also failed to provide any evidence that the basic and enhanced statutory damages under § 605 are insufficient to deter future violations of the Federal Communications Act. Indeed, conspicuously absent from Plaintiff's motion is any explanation for what a permanent injunction would add to the deterrent effect of the damages awarded under § 605. *See id.* Nor has Plaintiff established, or even alleged, that, without an injunction, it will suffer irreparable harm at the hands of Defendants, whose one-time violation does not demonstrate a pattern of illegal signal piracy. *See Lalaleo*, 429 F. Supp. 2d at 516 (rejecting

plaintiff's argument that "establishments that pirate one event
have or will pirate additional broadcasts in the future").
Although Plaintiff broadly asserts that it "has lost, and will
continue to lose its legitimate commercial customers who are
unwilling and financially unable to compete with unauthorized
establishments such as the Defendants'," (Pl. Mem. at 9),
Plaintiff provides no evidence that this apparent ongoing future
loss, which is not supported by sufficient evidence, is
attributable to Defendants, particularly in light of the
dissolution of the Establishment, (*see* Footnote 1, *supra*).
Accordingly, Plaintiff's request for a permanent injunction is
denied.

> D. ***Conversion Damages***

Finally, Plaintiff requests conversion damages under
state law. (Pl. Mem. at 16-17.) Conversion damages, however,
are not warranted because they "appear to be duplicative of the
damages already awarded for the Communications Act violation."
*Joe Hand Promotions, Inc. v. Soviero*, No. 11-CV-1215, 2012 WL
3779224, at *9 (E.D.N.Y. July 31, 2012) (rejecting plaintiff's
request for conversion damages at three times the amount of sub-
license fee cost), *adopted by* 2012 WL 3779221 (E.D.N.Y. Aug. 30,
2012); *see also Time Warner Cable v. Barnes*, 13 F. Supp. 2d 543,
549 (S.D.N.Y. 1998) (holding that "[a]llowing recovery under
[the Federal Communications Act and New York state law] would be

a double recovery, which is a mistake of law"); *Googies Luncheonette,* 77 F. Supp. 2d at 491 (holding that awarding relief under the common law for the same unlawful broadcast "would be duplicative of that under 47 U.S.C. § 605").

In *Soviero*, the district court accepted Magistrate Judge Cheryl Pollak's determination that conversion costs would be duplicative of the damages awarded under § 605 of the Federal Communications Act. *See* 2012 WL 3779224, at *9. Judge Pollak explained that the plaintiff lacked any justification for additional damages based on the common law theory of conversion. *Id.; see also Garden City Boxing Club Inc. v. Frezza*, 476 F. Supp. 2d 135, 140 (D. Conn. 2007) ("[W]hile plaintiff pleads that defendants obtained possession of the Program, wrongfully converted it to their own use, and did so willfully, maliciously, and intentionally to harm plaintiff and subject it to economic distress, plaintiff has offered no explanation for why these acts should entitle it to any additional damages which would be non-duplicative of the damages already awarded."). Here, Plaintiff similarly lacks any justification for additional conversion damages which are duplicative of the damages already awarded under § 605 of the Federal Communications Act. Accordingly, the court declines to award such damages.

**IV. Attorney's Fees, Costs, and Interest**

    **A.** *Attorney's Fees*

"Section 605(e) mandates that a prevailing plaintiff shall recover reasonable attorney's fees." *291 Bar & Lounge*, 648 F. Supp. 2d at 475-76 (citing 47 U.S.C. § 605(e)(3)(B)(iii)). "[W]hen assessing whether claimed legal costs [including attorney's fees] are reasonable," the district court exercises considerable discretion in determining "the 'presumptively reasonable fee' for an attorney's services by looking to what a reasonable client would be willing to pay, 'bear[ing] in mind *all* of the case-specific variables' that the courts have identified as relevant in setting a reasonable hourly rate." *Soviero*, 2012 WL 3779224, at *10 (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2007)).

"It remains the attorney's burden to maintain *contemporaneous* time records . . . indicating, for each attorney, the date, the hours expended, and the nature of the work done." *Id.* at 11 (emphasis added) (citations omitted). Moreover, "[f]ee applications are subject to denial where the fees have not been adequately documented." *Id.* (citing *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir. 1992)). Attorneys may appropriately support their fee requests with documentation other than the contemporaneous time records

themselves; however, these alternative documents must have been prepared or transcribed from contemporaneous time records. *See Soviero*, 2012 WL 3779224, at *12; *Joe Hand Promotions, Inc. v. Fofana,* No, 06-CV-2099, 2007 WL 2298372, at *6-7 (S.D.N.Y. Aug. 9, 2007) (citing cases).

Here, Plaintiff seeks a total of $3,165 in attorney's fees "along with attorney's fees for post-trial and appellate services." (Pl. Mem. at 17.) In support of its request, Plaintiff has submitted the Affirmation of Jon D. Jekielek, Esq., from Jekielek & Janis, LLP (the "law firm"). (ECF No. 28, Ex. 1B, Affirmation in Support of Attorney's Fees ("Jekielek Affirm.").) Mr. Jekielek's Affirmation provides a breakdown of the law firm employees who worked on the case, the dates and hourly rates billed by each employee, the legal services performed by those employees, and the amount of time each employee spent on each service. (*Id.* ¶¶ 6, 9, 12.) In his Affirmation, Mr. Jekielek avers that this particular case required the involvement of himself, one paralegal, and one administrative assistant. (*Id.* ¶ 6.) Mr. Jekielek further provides a chart itemizing Plaintiff's billable attorney's fees, including 9.7 hours of attorney time billed at $300 per hour; 1.1 hours of paralegal time billed at $150 per hour; and 1.2 hours of administrative assistant time billed at $75 per hour. (*Id.* ¶¶ 7, 9, 12.) Mr. Jekielek states that the "[b]illable

hours for legal services rendered are reconstructed by way of a thorough review of the files themselves." (*Id.* ¶ 8.) Therefore, these attorney's fee records were recreated after-the-fact and were not prepared from contemporaneous time records. The court finds that Plaintiff lacks proper documentation to support its attorney's fee application and therefore denies Plaintiff's request for attorney's fees.

In *Soviero*, a case involving the same Plaintiff, the same attorney, and the same attorney's fee amount of $3,165, the district court adopted Magistrate Judge Pollak's recommendation to deny Mr. Jekielek's fee application based on improper documentation. 2012 WL 3779224, at *11-12. In *Soviero*, Mr. Jekielek submitted "a chart containing summary descriptions of . . . legal services rendered, the date on which each service was performed, the type of staff member who performed the work . . . and the number of billable hours assigned to each task." *Id.* at 12. Despite Mr. Jekielek's submission of this itemized chart in *Soviero*, which is similar to the chart submitted here, Judge Pollak noted that Mr. Jekielek "failed to maintain or submit the required contemporaneous time records, or even a different form of documentation based on contemporaneous time records." *Id.* at *12. Furthermore, Judge Pollak found inadequate Mr. Jekielek's explanation that his firm's billable hours "[were] reconstructed by way of a thorough review of the files themselves" and

determined that "the Firm only determined the amount of time it spent on this case after-the fact, in preparation to file this motion, and did not rely on contemporaneous time records in doing so." *Id.* at *13.  Finally, Judge Pollak advised Mr. Jekielek that "[i]n the future, counsel would do well to maintain contemporaneous records." *Id.*

Notwithstanding this warning, Mr. Jekielek has apparently failed to maintain the required contemporaneous time records and relies instead on the same inadequate recordkeeping, and in this case, appears to have submitted a fee application nearly identical to the unsatisfactory fee application rejected by Judge Pollak in *Soverio*.  Because Plaintiff provides no indication that Mr. Jekielek maintained contemporaneous time records, Plaintiff's request for attorney's fees is respectfully denied.

**B.    *Costs***

An award of costs is mandatory under 47 U.S.C. § 605(e)(3)(B)(iii). *Autar,* 426 F. Supp. 2d at 65-66.  "Costs relating to filing fees, process servers, postage, and photocopying are ordinarily recoverable." *Teamsters Local 814 Welfare Fund v. Dahill Moving & Storage Co.*, 545 F. Supp. 2d 260, 269 (E.D.N.Y. 2008) (citing *Tips Exports, Inc. v. Music Mahal, Inc.*, No. 01-CV-5412, 2007 WL 952036, at *11 (E.D.N.Y. 2007)).

32

Here, Plaintiff requests reimbursement of costs in the amount of $1,000, including costs associated with filing the Complaint, serving process, and investigating the Establishment prior to the commencement of this action. (Pl. Mem. at 18; Jekielek Affirm. ¶¶ 2-4.) In support of its request for costs, Plaintiff submits Mr. Jekielek's Affirmation, which itemizes costs of $350 for the court filing fee, $150 for service of the Summonses and the Complaint upon Defendants, and $500 for investigative fees, but provides insufficient supporting documentation for these costs. (*See* Jekielek Affirm. ¶¶ 2-4.)

Although the court takes judicial notice of this district's filing fee amount of $350, the court finds that Plaintiff has failed to submit adequate documentary evidence in support of its request for $150 in service costs and therefore denies Plaintiff's request for reimbursement of such service costs. *Li Ping Fu v. Pop Art Int'l Inc.*, No. 10-CV-8562, 2011 WL 4552436, at *5 (S.D.N.Y. Sept. 19, 2011) ("The Court takes judicial notice of the Court's own filing fee amount, but plaintiff has not provided supporting documentation as to the service costs and therefore that amount is not recoverable."), *adopted in relevant part by* 2011 WL 6092309 (S.D.N.Y. Dec. 7, 2011); *see also Carrasco v. W. Vill. Ritz Corp.*, No. 11-CV-7843, 2012 WL 2814112, at *7 (S.D.N.Y. July 11, 2012) (taking judicial notice of court's $350 filing fee but declining to award service

costs that were unsupported by documentary evidence), *adopted by* 2012 WL 3822238 (S.D.N.Y. Sept. 4, 2012); *Kingvision Pay-Per-View, Ltd. v. Castillo Rest. Corp.*, No. 06-CV-617 (KAM), 2007 WL 841804, at *7 (E.D.N.Y. Jan. 16, 2007) (recommending denial of plaintiff's request for costs where plaintiff "submitted no documentary evidence in support of its request for $150 in costs"), *adopted by* No. 06-CV-617, slip. op. at 1 (E.D.N.Y. Mar. 16, 2007); *cf. Century 21 Real Estate LLC v. Bercosa Corp.*, 666 F. Supp. 2d 274, 300 (E.D.N.Y. Sept. 18, 2009) (recommending award of process server fees that were "adequately described and documented" but declining to recommend legal research costs where plaintiff "failed to provide any documentation").

With respect to investigative fees, the "'legislative history for § 605(e) instructs that the court has the power to direct the recovery of investigative fees, not that the court is required to order such an award.'" *Autar*, 426 F. Supp. 2d at 67 (quoting *Int'l Cablevision, Inc. v. Noel*, 982 F. Supp. 904, 918 (W.D.N.Y. 1997)); *Lalaleo*, 429 F. Supp. 2d at 517 ("'There is no provision, however, for a prevailing party to be awarded the cost of its investigator.'" (quoting *Time Warner Cable v. Sanchez*, No. 02-CV-5855, 2003 WL 21744089, at *5 (S.D.N.Y. July 8, 2003))). "In order to recover investigative costs a plaintiff must make a showing similar to that required to recover attorneys' fees." *Autar*, 426 F. Supp. 2d at 67. As

such, Plaintiff "must document '(1) the amount of time necessary for the investigation; (2) how much the investigators charged per hour; [and] (3) why the investigators are qualified to demand the requested rate.'" *Autar*, 426 F. Supp. 2d at 67 (alteration in original) (quoting *Noel*, 982 F. Supp. at 918). In *Autar*, the district court acknowledged that the plaintiff submitted evidence demonstrating that the investigator charged plaintiff for one hour of services at an hourly rate of $350; nevertheless, the *Autar* court denied plaintiff's request for investigative costs because plaintiff did not provide any evidence concerning the investigator's qualifications. 426 F. Supp. 2d at 67.

Plaintiff here provides even less documentation than the plaintiff in *Autar* and is therefore not entitled to reimbursement of $500 in investigative costs. Although the Affidavit of independent auditor Mr. Osgood describes the investigative work undertaken in support of Plaintiff's case, (Osgood Aff. at 2), the record is bereft of information regarding Mr. Osgood's hourly rate or the reasonableness of Mr. Osgood's fee in light of his qualifications. According to his Affidavit, Mr. Osgood arrived at the Establishment at 12:10 a.m. on November 21, 2010 and departed from the Establishment at 12:20 a.m. (*Id.* at 1-2.) Upon his departure, Mr. Osgood took two pictures of the Establishment at approximately 12:25 a.m.

35

(*Id.* at 2.)  Mr. Osgood's Affidavit, however, does not include his hourly rate or provide any basis to determine the reasonableness of the time spent on this investigation or the rate charged for that time. *See Music Mahal, Inc.*, 2007 WL 952036, at *12 (recommending no reimbursement for investigative costs because plaintiff failed to provide information regarding the reasonableness of rates for investigative services); *Autar*, 426 F. Supp. 2d at 67-68; *Sanchez*, 2003 WL 21744089, at *5 (limiting reimbursement of costs to $150 filing fee where plaintiff failed to submit the total number of hours spent on investigation and investigator's hourly rate).

In light of the foregoing, the court finds, based on the supporting documentation, that Plaintiff is entitled to an award of costs in the amount of $350 for the court filing fee.

**C.**   ***Interest***

Finally, Plaintiff seeks "post-judgment interest" on any money judgment "at the highest lawful rate." (Pl. Mem. at 18); 28 U.S.C. § 1961.  Plaintiff is entitled to statutory post-judgment interest on damages from the date of entry of judgment until the date judgment is paid in full. *See* 28 U.S.C. § 1961(a); *Garden City Boxing Club, Inc. v. Rojas*, No. 05-CV-1047, 2006 WL 3388654, at *9 (E.D.N.Y. Nov. 21, 2006) ("Of course, plaintiff shall be entitled to statutory post-judgment interest." (citing 28 U.S.C. § 1961(a))).  As such, post-

36

judgment interest shall accrue at the federal statutory rate until the judgment is fully paid. 28 U.S.C. § 1961.

## CONCLUSION

For the foregoing reasons, the court grants Plaintiff's motion for default judgment against Defendants and respectfully directs the Clerk of the Court to enter judgment in favor of Plaintiff and against the Establishment and Elmore, joint and severally, in the total amount of $4,965.80, comprised of basic statutory damages of $1,538.60, enhanced damages of $3,077.20, and costs of $350. Additionally, Plaintiff is awarded post-judgment interest on the money judgment at the federal post-judgment rate, which shall accrue as required by law from the date of entry of judgment until the judgment is paid in full. The court respectfully denies Plaintiff's requests for conversion damages, attorney's fees, and permanent injunctive relief. The Clerk of the Court is respectfully requested to close this case. Plaintiff is ordered to serve a copy of this Memorandum and Order on Defendants and file a declaration of service by June 3, 2013.

**SO ORDERED.**

Dated:    May 29, 2013
          Brooklyn, New York

                                        _____/s/_____
                                        KIYO A. MATSUMOTO
                                        United States District Judge
                                        Eastern District of New York